and it is Khungar versus Access Community Health. Good morning, your honors. Nancy Temple on behalf of the appellant, Dr. Pooja Khungar. All right, you may proceed. Thank you. Judges, this case obviously presents a genuine dispute of material issues of fact in an employment discrimination retaliation case. The record is pretty substantial. There's two termination decisions and thus two different causation analyses. First is the November 21st notice of the 90-day termination decision in November 21st, 2016. And Dr. Khungar had filed the charge with the EOC claiming that that termination decision was based on and caused by discrimination for her race and Indian heritage and religious affiliation that was non-Christian. She also in that charge filed on November 30, 2016, charged that the November 21st, 2016 termination notice was in retaliation for her opposition of what she reasonably believed was protected activity and discrimination against her in the workplace at this Hispanic clinic, primarily treating Hispanic patients and with Hispanic intervening more abrupt decision that occurred immediately on December 14, 2016, prior to the end of that 90-day notice period. And so that is a separate set of events. To be clear, Dr. Khungar, Dr. Pooja Khungar was working at the Kedzie Clinic and there was on-site an office manager who was not a physician, not a medical provider. Her name is Alicia Mariscal, but she certainly had management authority over the staff, including the physicians there, in terms of scheduling, affecting their privileges, and the terms and conditions of employment. And she also participated, Ms. Mariscal also normally participated in the interviews of what doctors to be hired for the Kedzie Clinic. The doctors reported as well to a regional medical director, which for the majority of Dr. Pooja Khungar's employment period was Dr. Charles Barron. He worked at a different clinic. He did not work on-site at the Kedzie Clinic. Dr. Charles Barron, according to the defendant's page four of their brief, his position ended August 12, 2016, and he left access employment at that time. The person who took Dr. Barron's position, the regional medical director, was Dr. Andres Mafla, who also worked at a different clinic facility. But the record is clear that Dr. Andres Mafla had no interaction or review of Dr. Khungar's work performance in any regard and did not function or participate in any employment issues or termination decisions concerning Dr. Khungar. That instead, the chief medical officer who worked at the headquarters of Access on Fulton downtown, his name is Javier or Jairo, excuse me, Jairo Mejia, Dr. Jairo Mejia, the chief medical officer. Instead, Dr. Mejia was the one who stepped in and took over Dr. Barron's role as the medical provider supervising and overseeing Dr. Khungar and made the actual termination decision that resulted in the 90-day notice on November 21, 2016. Now, there's no dispute that Dr. Mejia, Alicia Mariscal, and a pediatrician at the Access Clinic in Kedzie, Dr. Tara DeJesus, were all Hispanic. There were other Hispanic employees that were referenced, Gloria Rosales, a medical assistant who made derogatory ethnic comments about Dr. Khungar in May and June of 2016 that Dr. Khungar reported to the office manager and complained about to coworkers at that time. In addition, in November 2015, when Dr. Khungar sat down with Dr. Barron and Alicia Mariscal at the same time, Dr. Khungar raised with Dr. Barron the point that Alicia Mariscal in front of her, Dr. Khungar said this. Khungar said, Alicia Mariscal, when I started working here, made comments about me being an Indian woman and being pushy and other derogatory ethnic slurs. And she complained to Dr. Barron at that time in front of Alicia, and Charles Barron said, Alicia, don't do this. You can't do this. But after that, Alicia Mariscal retaliated against Dr. Khungar in many ways. She refused to allow Dr. Khungar to attend important pediatrician meetings that were performance, dramatic performance improvement meetings with an outside vendor. And this was important because Dr. Khungar's employment contract, just like Dr. DeJesus, had bonus compensation based on productivity. She was also evaluated under good citizenship. There was another instance where Dr. Khungar had asked for a day off from Alicia Mariscal in October 2016 and was going to go on vacation that day, and then afterwards found that the CEO of Axis was coming from the downtown area. And Alicia Mariscal said to her, no, you still have to take vacation. You can't come to this important CEO meeting. So there's bits and pieces of circumstantial evidence of how Alicia Mariscal demonstrated her animus toward her. Maybe we can cut right to the heart of the matter, which is a lack of causation. That's the problem for you and your client's claim here, because there isn't any evidence of causation because it was Dr. Mejia, if I'm pronouncing it correctly, who was responsible for making the termination decision, and there's no link. Your Honor, I believe there is evidence that links. He wasn't part of this friction, this sort of circle of friction that you're focusing on here. Yes, and let me explain what the evidence is that links it. First, Dr. Mejia testified a jury could discredit this, that he had no idea that Dr. Pooja Khungar was of Indian heritage. That defies credibility. In June 2016, Dr. Mejia was on the credentialing committee, along with Dr. Barron, Dr. Tarek Butt, who was the vice president, medical director, and they signed off on forms. They met, as Javier Landivar testified as a 30B6 witness, that they reviewed all of the information regarding her competence and ability and training, patient surveys. There was no issues about patient care, no concerns. Dr. Barron testified that he had no... When she was hired, we're talking about when she was fired. No, this was in June of 2016. But she was fired in November, right? She was hired in July of 20... Just the timeline. Dr. Khungar was hired in July of 2014. And as the 30B6 witness testified, each provider was given a two-year contract and credentialing, reviewing the status and privileges and the qualifications occurred every two years. So, her initial contract expired in July 2016. She worked successfully for two years. In June 2016, Dr. Mejia was on the committee that reviewed and understood that Dr. Barron and Dr. Butt, the vice president of health services, were recommending, and the credentialing committee recommended to the board to renew Dr. Khungar's contract for two more years, from July 2016 to July 2018. And that was approved, and she was notified of that. Dr. Mejia then testified that he... That she was... That he made the decision of immediate termination on September 28, 2016. So, that's a short time frame from approving her based on all the records and then making the decision. So, what happened? He claims he got multiple patient complaints. He admitted in his deposition that all of those complaints came through the safety zone portal and an electronic database that there was testimony by Alicia Maryskel. She typed in all of the complaints from Tara DeJesus, that Tara DeJesus made these complaints about Dr. Khungar. There's evidence in the record. You're not alleging, nor is there any evidence that either Dr. DeJesus or Alicia Maryskel fabricated these patient complaints? Yes, I am. Yes, we are. There was no identification. The cases say that if you document, if an employer documents secret complaints about a provider, about an employee, that can be an inference of intent to discriminate. I'm asking if the patient complaints were fabricated. You're not defending that there were no patient complaints. They're entirely a figment of Maryskel's and DeJesus's imagination, or at least for their conspiracy to frame her. Yes, that we believe that they have mischaracterized and exaggerated and made up and solicited complaints and mischaracterized them. And what do you base that claim? Dr. Khungar was never asked about any of these issues whatsoever. None of them came to her attention. She was never emailed any of these written complaints. She didn't even know about the safety zone portal till this litigation. None of the patients came to her. There's no independent record of a patient complaint. It's an email. The record we have from Access is an email from Tara DeJesus from her iPhone to Alicia Maryskel, the office manager who testified. And the electronic database shows she typed it into the safety zone portal. It automatically generated an email to HR and to Dr. Mejia. Nobody ever reviewed any medical records about any of these purported patient complaints. Dr. Khungar got, we identify this and attach it as an exhibit, that there were patient surveys and she got 80%, 77% positive feedback from patients. Well, that's something separate. You've never submitted an affidavit from your client denying that the things that the complaints had to do with never happened. Yes. For example, she testified in- Submitted an affidavit to that effect where she denied the substance of the complaints against her? Yes. One example is Tara DeJesus complained that Dr. Khungar supposedly changed a medical record or added a note onto a medical record of Dr. DeJesus. And Dr. Khungar explained all she did was sign off on a school physical form, which was normal practice. She didn't alter anything. She just used the existing medical record and signed it, which was routinely done. Dr. Khungar also denied that any patient complaint was ever brought to her attention. She denied in her deposition testimony that she ever said what Dr. DeJesus claimed she told patients that she missed something in somebody's ear. She denied that that happened. She denied that she missed any sort of tonsillitis or appendicitis issue. And there were no patient complaints ever filed. There were no malpractice claims or patient complaints. It's highly suspicious. Wait, let's get back. Just let's use one, the Q-tip in the ear. So what did she say about that? She denied that she was ever notified about it and she was unaware. And in her deposition, she never- She claimed it didn't occur. She testified it didn't occur. You're right. It's not in the declaration, specifically the Q-tip incident. Well, but denying it occurred would mean she said that they found a Q-tip in the ear at some later time, and she said she didn't know it was there, right? Yes, she denied that anything was missed. And Dr. Barron, too, testified that there were no adverse patient events. We don't have any actual complaint from a patient. We do have evidence that Dr. DeJesus misstated and had an animus against Dr. Coongar. Dr. DeJesus, Mokhtar- It's canceled. Your time has expired. Your time has expired.  Thank you. Mr. Cruz. Good morning, Your Honors. My name is Scott Cruz, and I represent the Appellee Access Community Health Network. Let me just take a moment to answer some of the questions that were posed to- Counsel, before you go on, how large is Access the network? Access currently, Your Honor, has about 30 to 36 health centers that it manages. I believe there are about 900 employees. How many positions? Good question, Your Honor. I would venture to say over 200, if not more. All right. Thank you. So I'd like to take a moment just to clarify many of the- I'll call it inaccuracies that the plaintiff's counsel responds to some of her questions that was posed by the court to her. There is no evidence of any fabrication here of these patient complaints. In fact, when I asked plaintiff in her deposition, when I went through each of these, and I asked her specific questions, her response was, I don't recall. I don't recall this. I don't recall this because I don't have the medical record. So for plaintiff's counsel to now state that Dr. Kunger, in fact, denied any of these happening is simply inaccurate when her disposition testimony is clear that she simply does not recall because she didn't have an opportunity to review the medical records. With that being said, it is our belief and position that the district court correctly granted summary judgment for access on plaintiff's discrimination and retaliation claims. The district correctly noted in terms of the plaintiff failed to meet her prima facie discrimination claim, specifically elements two and four of that discrimination claim. Plaintiff was required to provide evidence under element number two that she was meeting the performance expectations of her supervisor, Dr. Mejia at the time of the adverse employment action. Here, that is the termination recommendation that Dr. Mejia put forth to access his human resource department on September 28th, 2016. If you look at accesses and appendix to their brief appendix 001, 002 is the very email that Dr. Mejia sent on September 28th. In that email, Dr. Mejia specifically states in his termination recommendation to HR, he's recommending the termination because plaintiff's bad performance is putting our patients and the organization at risk. So at the very moment that he is recommending her termination, Dr. Mejia is indicating that he believes plaintiff's bad performance is putting the organization and patients at risk. He then goes on to state he considered a 2015 final warning that plaintiff received for a HIPAA violation. He then notes the many, he says we have an enormous amount of documentation. The documentation to which he's referring to, which the district court correctly reviewed and considered are the, as the district court's own words, multiple complaints that access received from these patients. Now, plaintiff has continuously alleged without any evidence, as the district court noted, that these were solicited complaints that Alicia Mariscal and Dr. Tara DeJesus, who by the way is not Hispanic, she's African American, that they solicited these complaints. And there's just simply no evidence of that. In fact, that the court noted the thin evidence, I think the court's own words in terms of what plaintiff's relying on is a statement that plaintiff takes out of context and the plaintiff does not in fact use the prior context. There's a statement made by Alicia Mariscal on September 30th, 2016. That particular statement, the plaintiff only uses a portion of it. Mariscal states, I know we're compiling information with Dr. Cougar. What plaintiff doesn't do is she doesn't identify the remaining portions of that statement where she says, but a provider must speak to her about all of the complaints on treatment and care of patients. And then during Mariscal's deposition testimony, when asked specifically by plaintiff's counsel to elaborate on that statement, Mariscal said, what I meant by the first portion of that is that Dr. Mejia had asked me to provide evidence of plaintiff's poor treatment. And that's what I meant by, I know we're compiling information. In that context, and based on that testimony, the district court correctly noted it is a stretch, the district court said, to read into that statement, that portion of it, that Mariscal was not simply following Dr. Mejia's directive to gather information about plaintiff's poor performance versus her actually going out and actively soliciting complaints. And when you look at the complaints themselves, each and every one of them, which we have identified here, it always starts out with a patient, the mother or the father came and approached Dr. Jesus, Dr. Alicia Mariscal. It is never that I went and talked to. In fact, in one of the particular instances, plaintiff tried to intervene. When she saw that the parent had talked to Dr. Jesus, a plaintiff rushed over and tried to intervene there. So there's no evidence at all of any solicited complaints here. In fact, the district court correctly noted it would be a leap of faith to infer this. Now getting back to the discrimination claim, the district court noted, of course, that not only a plaintiff failed to meet element two, but failed to meet element four of a prima facie case. No evidence of similarly situated individuals. Plaintiff identified Dr. Jesus and also identified a former medical assistant. And there's just quite frankly, no evidence there that any of those two were are properly similarly situated. District court could have ended its argument there as noted, but stated, we're going to go on. We're going to go on with the other elements of the McDonnell Douglas burden shifting framework. And it did, it found properly that access had presented a legitimate non-discriminatory reason for the termination. Of course, that are the multiple complaints from parents that were brought to access as attention. In addition to the HIPAA warning, the final HIPAA warning. Then the district court correctly concluded the plaintiff failed to present any evidence of any evidence of pretext. Now we believe we sufficiently addressed many of those arguments, but I want to take and address one particular argument and that relates the plaintiff's argument of a cat's paw theory. The cat's paw theory plaintiff alleges that there were certain non-decision makers, right? And she's claiming Alicia Mariscal, she's claiming Dr. Tara DeJesus. There's no evidence in the record that any of these individuals, first of all, had any termination. The district court correctly concluded that Dr. Mejia testified to that stating, of course, I'm the only one who came up with this decision. I didn't ask for input of anybody prior to making this decision. And so the district court correctly concluded that while plaintiff is alleging certain non-decision makers making alleged discriminatory remarks under seven circuit precedent, if you're not a decision maker, those alleged discriminatory marks do not evidence discrimination unless there's some evidence that these individuals had input into the decision and those discriminatory marks were made at or around the time of the decision. There's simply no evidence of that here. In fact, plaintiff does not attribute any alleged discriminatory remark to the two decision makers here, Dr. Mejia, who made the termination recommendation, and then subsequently Aliva Riley, who on December 14th rendered plaintiff's termination effective immediately, right? There's no evidence that anyone else had any input into the decision or was a decision maker. So it is our contention that the district court correctly granted accesses summary judgment on plaintiff's discrimination claim because plaintiff failed to meet her burden. Now, as it relates to the retaliation claim, we believe the district court correctly granted summary judgment on plaintiff's retaliation claim. The district court correctly concluded the plaintiff failed to present any evidence as this, as your honor noted this morning, there's no evidence of causation, right? The district court looked at the Ortiz decision, which said in order to meet causation, you have to show one cause the other, right? To protect the conduct, cause the adverse employment action. And we're specifically looking at the December 14th decision here to render from Ms. Riley to render plaintiff's termination effective immediately. And the district court looked specifically at an EEOC charge. An EEOC charge the plaintiff filed on November 30th, 2016, which was 14 days prior to Ms. Riley's decision. District court correctly noted under Seventh Circuit precedent that for suspicious timing, which was plaintiff's relying on here to raise an inference of causation. Well, the decision maker must have first been aware of the alleged protected conduct that alleged because she did follow the charge of discrimination and the record reflects here and it's conclusive and indisputable. Then it was not until December 23rd, 2016, that Ms. Riley, the decision maker on the 14th became aware that plaintiff had followed the charge of discrimination. It is on that day that access received notice in the mail from the EEOC that plaintiff had filed this charge of discrimination. And we've identified and provided the court the exact email, which was forwarded to Ms. Riley on December 23rd, which of course is nine days after Ms. Riley met with Dr. Cougar on December 14th. One other note as it relates to the retaliation portion that I want to bring up because plaintiff brought this up in her reply brief. But I want to again correct another inaccuracy from plaintiff. Plaintiff states on page 11 of her reply brief that there's an issue of fact here on the retaliation claim. She claims that Ms. Riley spoke with Alicia Mariscal prior to meeting with Dr. Cougar on the 14th. And the record simply does not reflect that. And the reason why plaintiff brings it up is because she's contending that on November 30th, plaintiff, after she filed her charge, told Mariscal that she had filed this charge. Now, first, the record and the record particularly is when I'm looking at the citation that plaintiff cited to, and my citation is document 4931, page ID 842, page 69, lines 16 through 24 of the deposition. And in that, there is absolutely no testimony whatsoever from Ms. Riley that she spoke to Mariscal prior to meeting with Dr. Cougar on the 14th. And of course, she couldn't have. Mariscal was on vacation as of December 11th, from December 11th to January 2020. Mariscal was not even aware that a reliever Riley had rendered plaintiff's termination effective immediately until after the fact. And plaintiff claims that this court can look at and create an issue of fact here, because if Riley spoke to Mariscal prior to 14th, well, it's obvious or should be that Mariscal would have told Riley about this charge of discrimination. Yet the record does not reflect the two spoke. The record rather reflects Mariscal wasn't anywhere near the house center. She was on vacation. Finally, Your Honor, I just want to address the other decision at issue here. And again, as plaintiff noted, that December 14th issue, as it relates to discrimination claim, plaintiff tries to argue pretext, claiming that, well, the decision that Riley made is based on a statement that I'm contending I did not make. And so because I'm contending I did not make it, well, that's pretext. And as the Seventh Circuit case law is very clear that a plaintiff cannot establish pretext simply by arguing the events for which I am accused, the events for which caused my termination did not occur. That is not a proper pretext argument. Proper pretext argument is not my employer is mistaken. My employer is incorrect. A proper pretext argument is my employer is dishonest. That reason is dishonest. And plaintiff simply quibbles, even with Dr. Mejia's decision, really quibbles with that decision. She says, well, he didn't talk to me. No one ever told me about these complaints. That's pretext. Again, she's quibbling with how he came to that decision. There is absolutely no evidence that Dr. Mejia and or Leva Riley did not honestly believe that the reasons they're providing for terminating plaintiff, one, for Dr. Mejia, that he actually believed that. Again, I point to the email that he sent at the very moment where he is recommending termination where he states plaintiff's bad performance is putting the organization and patients at risk. And then as it relates to Ms. Riley, the information that she gleaned and used to effectuate plaintiff's termination, let's be clear, plaintiff already was terminated. So on November 21st, this was merely Ms. Riley's 30 day notice. You're going to be terminated effective today. The information was from plaintiff. This is from plaintiff's own mouth. It isn't that we gleaned it from other sources. And plaintiff's attempting to say Ms. Riley could not have believed what I told her in that meeting. Again, there's no evidence of that. In fact, the evidence shows otherwise that after that termination on December 14th, Ms. Riley placed a security guard at the entrance of the CTSI facility based on what she perceived to be plaintiff's threat of after I leave, what happens if this place blows up? So with that, Your Honor, if there aren't any questions, we will rely on our pleadings and access. Thanks to court for its time this morning. Thank you very much, Ms. Temple. You had used all your time. I will give you an extra minute if you have some concluding thoughts in rebuttal. Thank you, Judge. Briefly, there's discrepancies in the record. Dr. Mejia wrote in one of the safety zone portal notes on comments that Dr. Kungar was under close observation. He admitted in his deposition that he never observed her. No one else was ever observing her. Nobody ever followed up. If they honestly believed that there was an issue, they didn't restrict her privileges. They didn't observe her. They didn't follow up. They didn't verify anything. He also wrote that she had a mental illness, and he admitted in his deposition he had no basis, in fact, to make that statement. The record on the December 14 termination, she did suffer damages because she could have apart, even if the November 21st termination was proper, it was cut short. She lost that income, and it hurt her emotionally and reputationally. The record shows that. All right, Ms. Temple, you have used all your time. Thank you very much. Our thanks to both counsel. We'll take the case under advisement.